**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Raymond A. VALENTI, Defendant–Appellant, Cross–Appellee.**

Nos. 96–2517, 96–2726.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1997.

Decided Aug. 14, 1997.

John G. McKenzie (argued), Office of the U.S. Attorney, Rockford, IL, for plaintiff-appellee, cross-appellant.

Mark A. Byrd, Byrd & Taylor, Rockford, IL, for defendant-appellant, cross-appellee.

Before WOOD, Jr., COFFEY and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Raymond Valenti, as he himself admits, was a good carpenter but a bad record-keeper. He kept no records of expenses, deductions or income from his carpentry business. He did not have a bank account and he dealt exclusively in cash. Beginning as early as 1970, Valenti also failed to pay his federal income taxes. After several years of assisting him in preparing late returns and negotiating settlements for unpaid taxes, the IRS lost its patience and went after Valenti with criminal charges. A jury convicted Va-

lenti of most of the charges, and he now appeals those convictions and several aspects of his sentence. The government cross-appeals the district court's decision to vacate the jury's verdict and enter judgment of acquittal on one count.

## I. Facts

Between 1988 and 1993, the tax years at issue in this case, Valenti worked as a carpentry subcontractor on the construction of new houses in the Rockford, Illinois area. Valenti made a point of structuring his finances so as to keep the IRS ignorant of much of his income. He used cash for everything from paying his employees to paying for expensive gambling vacations to Las Vegas. When he received checks as payment for a job, he cashed them at the banks on which they were drawn. Sometimes his friend Eugene Ray, a general contractor for whom Valenti worked, cashed checks for Valenti. Ray would also deposit Valenti's checks into his account and then withdraw the money in cash for Valenti.

Valenti's reason for not having a bank account and using only cash was not just an eccentric aversion to banks. The IRS was his reason, and he went to great lengths to keep his financial information from the IRS. In 1987, Valenti was cashing a check for $10,100.00 when he learned of the new federal requirement for filling out a Currency Transaction Report (CTR) for cash transactions exceeding ten thousand dollars. The next time Valenti was issued a check for more than ten thousand dollars, the company issuing the check at his request voided it and instead issued three separate checks, each for less than ten thousand dollars. Valenti cashed two checks one day and the third check the next day, thus avoiding filling out a CTR, which the IRS would have received. Valenti used similar methods to avoid the CTR in later transactions.

Naturally, Valenti paid his employees in cash. He also did not keep records of their pay or withhold income taxes from it. He did not send W–2 or 1099 forms to his employees or to the IRS. Valenti told one employee that because he was not withholding taxes, the effect was that the worker made three dollars more per hour. He also gave them additional compensation in the form of meals, paid for in cash. Valenti indicated to his employees that they should not worry about paying income taxes because their wages were not being "claimed." Consequently, most of them did not report the wages they received from Valenti, and several of them did not file tax returns while they worked for Valenti. Valenti felt no responsibility for any tax problems his employees might face as a consequence, however; Valenti stated at trial that they were obligated to pay their own taxes and should have filed their returns.

Valenti took in and handed out cash without keeping any records of where the money came from or where it was going. Every five to seven years, the IRS would locate him and initiate the process of collecting back taxes and levying on his home. With the help of accountants and attorneys, the IRS, being unusually patient, would help Valenti piece together his income and expenses. In 1979, the IRS recovered $31,772.56 in back taxes from Valenti in exchange for a release of a levy on his home.

Not only did Valenti structure his transactions to keep the IRS from discovering his income, but he bragged to others about not paying taxes. He would laugh and say he could always find a loophole to get around the IRS. This bravado did not mean he was entirely confident, however. After Valenti learned the IRS was investigating him for criminal tax evasion charges, he told employee James Childress that if Childress talked to the IRS, he (Childress) would disappear. When Kenneth DeVlieger, another of Valenti's employees and his son-in-law, received a summons to testify about Valenti before the IRS, Valenti told him that he could assert his Fifth Amendment privilege, because DeVleiger had not reported the income he received from Valenti. DeVlieger took this statement to be both advice and a warning; Valenti had told him in the past how a person had tried to turn Valenti in and had gotten into tax trouble while Valenti did not. Valenti told DeVlieger that after he testified, Valenti would be waiting for him outside the IRS office. Valenti also approached Ada

Ricker, his ex-wife, from whom he had had a bitter divorce and whom he had not seen in years. He told her that he belonged to the Mafia. Valenti poked Ricker in the chest and warned her that if she talked to the IRS, she would be in trouble, too, because the investigation was going back to the years when they were married.

In spite of Valenti's attempts to scare potential witnesses, the government succeeded in indicting him for tax evasion. The superseding indictment charged Valenti with four counts of income tax evasion for tax years 1988 through 1991, six counts of failure to file income tax returns for tax years 1988 through 1993, one count of endeavoring to obstruct and impede the due administration of income tax laws, and one count of intimidation of a witness. The government dropped the intimidation of a witness count, and a jury convicted Valenti on the remaining eleven counts. Before sentencing, however, the district court vacated the jury's verdict on Count 11 (endeavoring to obstruct or impede the due administration of income tax laws) and entered a judgment of acquittal. The court, having found that Valenti attempted to perjure himself and obstruct justice, then sentenced Valenti to concurrent terms of 26 months' imprisonment on the tax evasion counts, followed by 3 years of supervised release, and concurrent terms of 12 months' imprisonment on the failure to file counts, followed by 1 year of supervised release for each count.

On appeal, Valenti claims the evidence was insufficient to convict him. He also appeals the court's use of his earlier relevant conduct in calculating his sentence and its refusal when calculating the total tax loss to credit his evidence estimating deductions and exemptions. The government appeals the district court's decision to vacate the jury's verdict and enter judgment of acquittal on Count 11. For the following reasons, we affirm the district court on the sufficiency of the evidence and sentencing issues, and reverse and remand for sentencing on Count 11.

## II.

■ We begin with the government's cross-appeal. Count 11 specifically alleged that Valenti "corruptly endeavored to obstruct and impede the due administration of Title 26, United States Code, by causing and attempting to cause others not to talk to or cooperate with Internal Revenue Service employees in the tax-related investigations of defendant. . . ."

The statute on which Count 11 was based states:

**(a) Corrupt or forcible interference.**— Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, *or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title*, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term "threats of force," as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

26 U.S.C. § 7212(a) (emphasis added). Count 11 charged Valenti only with "corruptly" obstructing or impeding, and not with obstructing or impeding "by force or threats of force," as the statute also allows. At trial, the government presented evidence of Valenti's conversations with Childress, DeVlieger and Ricker, in which he tried to dissuade them from cooperating with the IRS, to prove Valenti's guilt on Count 11. During deliberations, the jury sent the district court a question, which stated:

Would you please come and explain and clarify Title 26, Section 7212. We are unclear as to whether it means to include just the physical threats that Mr. Valenti was accused of or could also include other ways of impediment in Count 11.

After consulting with the attorneys, the district court, relying on *United States v. Popkin,* 943 F.2d 1535 (11th Cir.1991), and *United States v. Reeves,* 752 F.2d 995 (5th Cir. 1985), gave this response:

> Corruptly as set forth in the statute is used for the purpose of forbidding those acts done with the intent to secure an unlawful benefit either for oneself or for another.

Not long after receiving this instruction, the jury returned verdicts of guilty on all eleven counts.

Valenti filed a Motion to Reconsider and to Dismiss Count 11, arguing that the response to the jury question during deliberations constituted a constructive judicial amendment of the indictment which prejudiced him because it amounted to more than a mere variance between the charge and the proof. The court granted this motion. It held that "corruptly" could not include within its definition "by force or threats of force," because those were other methods of committing the offense, set forth in the statute disjunctively. In the district court's view, the government did not prove what it alleged in the indictment because it focused its proof on Valenti's alleged threats, instead of on any "corrupt" actions.

 We review the district court's construction of the relevant statute *de novo. United States v. Montoya,* 827 F.2d 143, 146–47 (7th Cir.1987). However, we review a sufficiency of the evidence argument in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Theodosopoulos,* 48 F.3d 1438, 1449 (7th Cir.1995) (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). "A jury conviction should be taken away 'only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Theodosopoulos,* 48 F.3d at 1449 (*quoting United States v. Rosalez–Cortez,* 19 F.3d 1210, 1215 (7th Cir.1994)).

After examining the indictment and the evidence presented to prove Count 11, we conclude that the district court, though not without some reasons, was nevertheless incorrect in holding that the evidence proved something different than what the indictment alleged. Count 11 charged that Valenti violated § 7212(a) by "causing and attempting to cause others not to talk to or cooperate with" the IRS, and that he did this "corruptly." The government conclusively proved that Valenti's actions were designed to cause his ex-employees and ex-wife not to talk to or cooperate with the IRS. There are *no details* in the indictment to which the proof did not conform. *See United States v. Willoughby,* 27 F.3d 263, 265–66 (7th Cir.1994). The more difficult issues are whether Valenti attempted to cause the witnesses *not to testify* "corruptly" or with threats of force, and whether "corruptly" can include "threats of force" within its definition.

Valenti spoke to Childress, DeVlieger and Ricker all with the specific purpose of convincing them not to cooperate with the IRS. This attempt to silence witnesses clearly satisfies the definition of "corruptly." Valenti did it intending to secure an unlawful benefit for himself, that is, he attempted to silence them for no other reason than to obstruct the IRS investigation. He also used threats of force to accomplish this goal; for example, he told Childress that if Childress testified about Valenti, Childress would disappear, and he told Ricker that he was in the Mafia, implying that she might suffer retaliation if she testified. But Valenti also used more subtle methods to convince these witnesses not to testify. He insinuated that if they testified, they might also get into trouble with the IRS, but as he had no power directly to make them targets of an IRS investigation, these were empty "threats of force" at best. His conversations with DeVlieger did not involve direct threats of force, either. Knowing that DeVlieger had not reported the income he received from Valenti, he told DeVleiger to plead the Fifth and that he would be waiting outside after DeVlieger testified. But though Valenti had told DeVlieger in the past that another person who tried to turn him in had gotten into trouble, he did not repeat that story when he talked to DeVlieger about his summons, nor did he

imply that he would harm DeVlieger if DeVlieger testified. He may have counted on DeVlieger's remembering the story, but his suggestion that DeVlieger take the Fifth was, on its face, just that—a suggestion which, if taken, would have benefited Valenti by keeping important information from the IRS. It was not a threat of force.

That Valenti tried to secure an unlawful benefit for himself partly through the use of threats does not diminish the fact that his actions were also corrupt within the definition given by the court. "Corruptly" refers to the mental state with which the actions are performed, *see United States v. Hanson*, 2 F.3d 942, 946–47 (9th Cir.1993), and the wording of § 7212(a) certainly does not preclude the government from proving that mental state with evidence of threats, even if the government has not specifically charged the defendant with making threats in the indictment. The jury reasonably concluded that Valenti's acts were corrupt: his statements, whether threats or not, were designed to convince Childress, DeVlieger and Ricker not to testify, and so to unlawfully secure a benefit for himself. We find the evidence was clearly sufficient to sustain the jury's verdict of guilty on Count 11.

### III.

### A.

We turn now to Valenti's appeals. First, Valenti claims the evidence presented at trial was insufficient to support his convictions for tax evasion and failure to file tax returns. When evaluating a sufficiency of the evidence claim, we must determine "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). Furthermore, "[o]nly when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Marren*, 890 F.2d 924, 933 (7th Cir.1989). Valenti argues that he has met this substantial burden on two fronts: the evidence did not prove that he acted willfully, nor did it prove he made an affirmative act constituting an evasion or attempted evasion of tax.

"Willfulness" is defined for the purposes of the crimes of tax evasion and the failure to file tax returns as "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991) (*citing United States v. Bishop*, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973) and *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976)). To prove that Valenti acted willfully, the government had to prove that the law imposed a duty on him, that he knew of the duty, and that he voluntarily and intentionally violated that duty. *Cheek*, 498 U.S. at 201, 111 S.Ct. at 610.

Valenti does not dispute that the law imposed a duty on him or that he knew of this duty. He had filed tax returns in the past and he had an accountant to assist him in preparing his taxes. Valenti also had many dealings with the IRS, which for many years attempted to collect Valenti's unpaid taxes without filing criminal charges. Valenti claims, however, that none of the evidence proved that he voluntarily and intentionally violated his duty to pay taxes. He claims that by coming every few years to settle his tax debt but never bringing him current on his taxes, the IRS actually misled him into thinking that he did not have to file his tax returns. He came to believe, he states, that this was the IRS' procedure for "people like him," and that he did not have to file his tax returns himself because in a few years the IRS would be back to "settle up." The jury rejected this argument, as do we. There is evidence directly contradicting Valenti's portrayal of himself as an unwitting innocent who naively trusted the IRS to take care of him. At the top of the list is certainly Valenti's habit of bragging to others about not paying taxes and always finding a loophole to get around the IRS. Furthermore, the evidence also revealed that Valenti did not open a bank account specifically because he did not want to pay taxes. He also deliberately structured his financial transactions to avoid

filling out CTR forms, which would have alerted the IRS to unreported income. We hold there was clearly sufficient evidence of Valenti's willfulness.

■■■ Valenti next claims that the evidence was insufficient to prove he acted affirmatively in evading tax. ' A key part of proving tax evasion is demonstrating that the defendant committed an affirmative act constituting an evasion or an attempted evasion of tax. *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965). The government must prove more than merely that the defendant willfully failed to file a tax return. *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). However, any conduct that is likely to have a misleading or concealing effect can constitute an affirmative act. *Id.* An act, "even though a lawful activity in-and-of-itself, can serve as an 'affirmative act' ... if it is done with the intent to evade income tax." *United States v. Jungles,* 903 F.2d 468, 474 (7th Cir.1990). Many such acts were proven here.

First, the government clearly established Valenti's penchant for using cash. He paid for everything in cash. As we have already stated, part of the reason he used cash all the time was that he did not have a bank account, and he didn't have a bank account because he wanted to conceal his financial condition. He directed his friend, Eugene Ray, to deposit Valenti's checks into Ray's bank account and then withdraw the money in cash and give it to Valenti. When done with the intent to evade, the extensive use of cash can be an affirmative act, even though the use of cash alone is far from being criminal. *See id.; United States v. Holovachka,* 314 F.2d 345, 358 (7th Cir.1963). Valenti's extensive use of cash was not innocuous; rather, it was an integral part of his plans to avoid paying taxes. The jury also could have considered Valenti's method of running his business to be an affirmative act. He refused to keep records of any kind, whether relating to his income, his expenses, or his employees. Valenti paid his employees in cash and deliberately did not report their wages to the IRS; he advised them that they also did not have to pay their income taxes.

Because an affirmative act can be the "handling of one's affairs to avoid making records usual in transactions of the kind," *Spies,* 317 U.S. at 499, 63 S.Ct. at 368, and because that is what Valenti was doing, we hold the evidence was clearly sufficient to establish that Valenti committed an affirmative act constituting an evasion or attempted evasion of tax.

### B.

■■■ Next, Valenti argues that the district court erred when it calculated the total tax loss for which Valenti was responsible, because it refused to give weight to Valenti's testimony that he was entitled to certain deductions and exemptions from income during tax years 1988 to 1993. We review a district court's factual findings under the Sentencing Guidelines for clear error, *United States v. Jackson,* 95 F.3d 500, 505 (7th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 404, 136 L.Ed.2d 318 (1996); *United States v. Benitez,* 92 F.3d 528, 536 (7th Cir.1996), and we will not reverse unless, after reviewing the record, we are firmly convinced that the district court has made a mistake. *See United States v. Carmack,* 100 F.3d 1271, 1276 (7th Cir.1996).

In cases involving tax evasion and failure to file tax returns, the sentencing court may use the government's evidence of the total tax loss to determine a defendant's base offense level. U.S.S.G. § 2T1.1(a)(1). For tax years 1988 through 1991, the years for which Valenti was convicted of tax evasion, the district court used the tax loss amounts that the government proved at trial. For tax years 1986, 1987, 1992 and 1993, however, the court used U.S.S.G. § 2T1.1(c)(2) to measure the tax loss at twenty percent of Valenti's gross income. The total tax loss came to $103,210, resulting in a base offense level of 14.

Valenti claims the court's use of § 2T1.1(c)(2) was in error; he argues this was not the most accurate way of determining total tax loss, and that instead, the court should have credited his testimony and exhibits which demonstrated certain business and personal deductions. He claims the government measured his annual gross income

for the years 1988 through 1993 at over $600,000 without giving him any credit for legitimate business expenses such as the purchase of tools, scaffolding, gasoline, ladders, etc. Using the exhibits he presented demonstrating these expenses, he asserts, would have offered a more reasonable and credible way of estimating his gross income for those tax years.

The district court, however, rejected Valenti's testimony as speculative and incredible, and noted that by contrast, the government had tried to accurately measure his expenses. The court also noted that Valenti likely got off easy under the government's method because additional unreported income probably existed. Because the district court was in the best position to judge Valenti's credibility, and because a fact-finder's choice between two permissible options cannot be clearly erroneous, *United States v. Yusuff,* 96 F.3d 982, 989 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 999, 136 L.Ed.2d 878 (1997), we affirm the court's decision to use the Guideline method of determining tax loss instead of Valenti's method.

### C.

 Finally, Valenti claims that at sentencing, the district court violated his right to due process when it considered his gross income for tax years 1986 and 1987 as relevant conduct. Because those tax years fell outside the statute of limitations, the government could not prosecute him for his failure to pay those taxes, and Valenti claims the court should not have included that income when it computed his sentence. We review statutory interpretations of the Sentencing Guidelines *de novo. Carmack,* 100 F.3d at 1278–79; *Jackson,* 95 F.3d at 505.

 It is well established that in determining a defendant's sentence a court may consider a broad range of information, including uncharged crimes, crimes where charges have been dismissed, and crimes for which the defendant has been acquitted. *See United States v. Ritsema,* 31 F.3d 559, 567 (7th Cir.1994); *United States v. Tucker,* 20 F.3d 242, 245 (7th Cir.1994); *United States v. Smith,* 5 F.3d 259, 262 (7th Cir.1993); *United*

*ed States v. Smith,* 953 F.2d 1060, 1066 (7th Cir.1992); U.S.S.G. § 1B1.3(a)(2). The Application Notes to § 1B1.3 "illustrate that relevant conduct does not focus on acts for which the defendant is criminally accountable." *United States v. Matthews,* 116 F.3d 305, 307 (7th Cir.1997), citing U.S.S.G. § 1B1.3, n. 1.

 This court has recently joined six other circuits in holding that the statute of limitations does not limit what actions a court may consider as relevant conduct when sentencing a defendant. *Matthews,* 116 F.3d at 307; *see also United States v. Behr,* 93 F.3d 764 (11th Cir.1996); *United States v. Silkowski,* 32 F.3d 682, 687 (2d Cir.1994); *United States v. Pierce,* 17 F.3d 146, 150 (6th Cir. 1994); *United States v. Neighbors,* 23 F.3d 306, 310–11 (10th Cir.1994); *United States v. Wishnefsky,* 7 F.3d 254, 256–57 (D.C.Cir. 1993); *United States v. Lokey,* 945 F.2d 825, 840 (5th Cir.1991). A criminal defendant is entitled to due process at sentencing; it is clear, however, that due process does not extend so far as to grant him full trial rights with regard to other crimes he has committed. *United States v. Radix Labs., Inc.,* 963 F.2d 1034, 1039 (7th Cir.1992). Due process at sentencing requires only that Valenti be given a fair sentencing hearing and that his sentence be based on fair and accurate information. *Id.* Valenti has contested neither the procedural fairness of the hearing nor the accuracy of the district court's determination of his gross income for tax years 1986 and 1987. The district court properly considered that income as relevant conduct when calculating Valenti's sentence.

### IV.

In conclusion, we affirm Valenti's conviction and sentence for Counts 1 through 10 for his egregious tax conduct, but we reverse the district court's judgment of acquittal on Count 11. We therefore remand Count 11 for reinstatement of the jury's verdict of conviction and for sentencing.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.